UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| WESTFIELD INSURANCE COMPANY, | ) | |
|---|---|---|
| Plaintiff, | ) | 3:21-CV-00003-DCLC |
| vs. | ) | |
| FRANCIS BYRD and KENNETH EVANS, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Westfield Insurance Company ("Westfield") filed this action to enforce an Agreement of Indemnity ("Indemnity Agreement") executed between Westfield and Defendants Francis Byrd and Kenneth Evans (collectively the "Indemnitors")[1] who signed the Indemnity Agreement on behalf of K & F Construction, Inc. ("K & F Construction") [Doc. 1]. Westfield has filed a motion for summary judgment seeking damages for breach of contract and specific performance in the form of collateral [Doc. 19], Defendants have filed a response in opposition [Doc. 26] and Westfield has filed a reply [Doc. 33]. For the reasons stated herein, Westfield's motion for summary judgment is **GRANTED**.

---

[1] Westfield's complaint also asserts claims against Defendant Randy Byrd, but Mr. Byrd passed away on December 26, 2021 [*See* Doc. 38]. Westfield filed a motion to dismiss its claims against Randy Byrd without prejudice [Doc. 41] which the Court granted [Doc. 42]. On summary judgment, Westfield asserts its claims against the remaining living Indemnitors Francis Byrd and Kenneth Evans, noting that the Indemnity Agreement provides that the Indemnitors are each jointly and severally liable for Westfield's losses per the Indemnity Agreement [*See* Doc. 1-1, pg. 1].

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2011, K & F Construction asked Westfield to issue surety bonds in connection with a number of its construction contracts in and around Knoxville, Tennessee. As a condition for issuing the bonds, Westfield required the Indemnitors to sign an Indemnity Agreement [Doc. 1-1]. The Indemnity Agreement requires the Indemnitors to exonerate, indemnify, and/or collateralize Westfield against any losses or liability related to the bonds, as follows:

> **INDEMNITY**
> The Indemnitors shall exonerate and indemnify [Westfield] from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which [Westfield] may sustain:
>
> (1) by reason of having executed or procured the execution of the Bonds;
> (2) by reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement; or
> (3) in enforcing any of the covenants and conditions of this Agreement.
>
> Whenever liability exists or is asserted against [Westfield], whether or not [Westfield] shall have made any payment therefor, [Westfield] may demand, and the Indemnitors shall deposition with the Surety, cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to [Westfield] in its sole discretion.
>
> In the event of any payment by [Westfield], the Indemnitors further agree that, in any accounting between [Westfield] and the Indemnitors, [Westfield] shall be entitled to charge for any disbursements made by it regarding the matters herein contemplated under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by [Westfield] shall be prima facie evidence of the fact and amount of the liability to [Westfield]. [Westfield] shall have every right and remedy which a personal surety without compensation would have, including the right to secure its discharge on any Bond.

[Doc. 1-1, pg. 1, ¶ 2]. Once the parties executed the Indemnity Agreement, Westfield issued a number of surety bonds to K & F Construction, including one for building improvements to the College of Veterinary Medicine at the University of Tennessee (the "College Contract Bond"),

one for paving and site repairs at the Middlebrook State Office Building (the "Middlebrook Bond") and one for expansion of the John Sevier Veterans Cemetery (the "Veteran Cemetery Bond") [Doc. 25, ¶ 2]. K & F Construction left a number of expenses unpaid for these construction projects which led to claims against the Westfield surety bonds [Doc. 21, ¶ 3].

Carolinas Construction Solutions, LLC ("CCS"), a subcontractor for K & F Construction, sued Westfield and K & F Construction[2] on July 26, 2016 for unpaid labor and services related to the College Contract Bond [Doc. 1-2]. Initially, Westfield's attorney, Jarrod Stone ("Stone"), represented Westfield in the CCS action, but withdrew so that Attorney Dail Cantrell ("Cantrell"), who already represented K & F Construction, could represent both Westfield and K & F Construction [Doc. 34-3]. But in November 2020 K & F Construction began the process of filing for bankruptcy[3] [*see* Doc. 34-3, Doc. 34-4]. Cantrell then withdrew and Stone took over representing Westfield once again [Docs. 34, ¶ 7, 34-4, 34-5]. Thereafter, CCS sought to recover $172,613.67 directly from Westfield related to the College Contract Bond [Doc. 1-3]. On November 16, 2020, Westfield demanded the Indemnitors deposit cash or collateral in the amount of $200,000 to cover the CCS claim and attorneys' fees and expenses, but the Indemnitors refused [Doc. 1-6, Doc. 1, ¶¶ 26, 27]. Westfield eventually settled the CCS lawsuit for $47,500 [Doc. 33-2]. After K & F Construction filed for bankruptcy, Duracap Asphalt Paving Company, Inc. ("Duracap") and Total Property Management ("TPM") asserted claims against the Middlebrook

---

[2]  CCS filed the action against K & F Construction, Inc., Westfield Insurance Company, and Rutledge Pike Electric Company, LLC ("RPE") in the Chancery Court for Knox County, Docket No. 192043-3 on August 3, 2016 [Doc. 1-2]. CCS had furnished electricians to RPE, a subcontractor of K & F Construction, on the College Contract, and claimed it was never paid by RPE. CCS ultimately dismissed its claims against RPE after RPE petitioned for bankruptcy protection [see Doc. 1-3; Doc. 33, pg. 19, n. 7].

[3]  K & F Construction petitioned for bankruptcy protection on November 16, 2020 in the United States Bankruptcy Court for the Eastern District of Tennessee, Case No. 3:20-bk-32553.

Bond, with Duracap claiming $101,847.25 plus attorneys' fees and interest [Doc. 1-4], and TPM claiming $40,781.09 [Doc. 1-5]. Wilbert Funeral Services later asserted a claim against the Veteran Cemetery Bond in the amount of $105,749.64 [Doc. 21, pg. 3]

In light of its settlement payment to CCS and the additional claims against the bonds, Westfield brought this action against the Indemnitors seeking enforcement of the Indemnity Agreement. In its complaint, Westfield initially sought (1) specific performance of the deposit of $350,000 collateral to secure the Indemnitors' obligations to Westfield resulting from the outstanding claims against the bonds [Doc. 1, ¶ 30], and (2) an entry of judgment for breach of contract damages in an amount sufficient to exonerate and indemnity Westfield against liability for losses and expenses related to the bonds [Doc. 1, ¶¶ 37-42]. By the time Westfield's motion for summary judgment became ripe, Westfield had reduced its claim for collateral to $163,247.51.[4] By February 14, 2022, Westfield had incurred actual expenses related to the bonds totaling $104,611.92[5] [Doc. 21, pg. 2; Doc. 25, ¶ 3]. Westfield seeks reimbursement from the Indemnitors, jointly and severally, in this amount, plus additional losses and expenses as they continue to accrue

---

[4] In its motion for summary judgment, Westfield reduced its initial collateral demand from $350,000 to $225,000 [Doc. 20, pg. 19; Doc. 25, ¶ 6]. This was based on Westfield's estimate that the unresolved liability against the bonds totaled $195,247.51 [Docs. 20, pg. 7 and 25 ¶ 5]. In its reply brief, Westfield further reduced the collateral demand to $163,247.51 after deducting attorneys' fees and expenses and deducting $32,000 to reflect the reduction of the Duracap claim by that amount [Doc. 33, pg. 23].

[5] In its motion for summary judgment, Westfield sought reimbursement for expenses totaling $99,496.92 [Doc. 20, pg. 19]. The accrued losses and expenses totaled $104,611.92 as of February 14, 2022 and continue to increase [Doc. 34-1; Doc. 33, pg. 2, n.2]. The Second Pentecost Affidavit adds the expense figures incorrectly. It quotes an amount of $5,445.00 paid by Check # 2575636 to the Manier & Herod PC law firm [Doc. 34, pg. 2], when in actuality that check was written for $5,115.00 [Doc. 34-1, pg. 12]. Thus, the correct amount of payments Westfield had accrued by February 14, 2022 is $104,611.92 as reflected in the receipts [Doc. 34-1], not $104,941.92 as quoted in the Pentecost Affidavit [Doc. 34, ¶ 2]. The Court will use the correct calculation throughout the memorandum opinion, though the citations will reflect the incorrect number.

[Doc. 20, pg. 19].

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy*, *Inc.*

*v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

III. **ANALYSIS**

A. **Westfield's request for reimbursement from the Indemnitors for actual losses incurred.**

Westfield seeks reimbursement from the Indemnitors for the actual expenses it has already paid related to the K & F Construction bonds, which include the CCS settlement payment, attorneys' fees and court costs [Doc. 1, ¶¶ 37-42]. Westfield claims it has paid $99,496.92 [Doc. 20, pg. 6, Doc. 25, ¶ 3] and noted in its reply brief this number had grown to $104,611.92 as of February 14, 2022 [Doc. 34, pgs. 1-2; Doc. 34-1]. The Indemnitors dispute Westfield's loss calculations, arguing that Westfield has not provided sufficient proof of its actual payments and expenses [Doc. 26, pg. 2; Doc. 25, ¶ 3]. The Indemnitors cite Westfield's complaint "generally," and several paragraphs from the Affidavit of Francis Byrd (the "Byrd Affidavit"), but do not explain how these citations serve to dispute Westfield's accounting [Doc. 25, ¶ 3]. Thus, it is unclear what portion of the complaint the Indemnitors intend to serve as facts in dispute of Westfield's loss figure, except perhaps that the complaint does not assert a specific loss amount. It is true the complaint does not claim a specific dollar amount of losses. Instead, Westfield claims it sustained "actual losses/expenses (including, but not limited to, interest, court costs, and counsel fees)" and prays for an entry of judgment against the Indemnitors "in an amount sufficient to fully exonerate and indemnify Westfield" from all liability and losses pursuant to the Indemnity Agreement [Doc. 1, ¶¶ 39. 42(c)]. But the complaint also states that investigation into the claims against the surety bonds remain "ongoing" [Doc. 1, ¶¶ 21, 24], and Westfield has since provided detailed receipts and vouchers to prove its paid losses up to February 14, 2022 [*see* Doc. 34-1].

6

The Indemnitors next cite portions of the Byrd Affidavit to dispute Westfield's claimed loss amount [Doc. 25, ¶ 3, citing Doc. 27, ¶¶ 9, 15, 20, 24, 26, 30, 31, 33, 34, 35]. In several of these paragraphs, Byrd repeats that she has no knowledge that Westfield paid any losses or expenses beyond the $47,500 settlement amount to CCS, and that Westfield has provided no proof to back up its claim for reimbursement [Doc. 27 ¶¶ 9, 15, 20, 24, 33, and 34]. But as stated above, Westfield has provided detailed proof of its claimed losses/expenses through the vouchers and receipts of payment as well as through the Declaration of its Senior Surety Claims Counsel, Daniel Pentecost ("Pentecost") [Doc. 34, 34-1]. The Indemnity Agreement provides that the "vouchers or other evidence of any such payments made by [Westfield] shall be prima facie evidence of the fact and amount of the liability" owed to Westfield by the Indemnitors [Doc. 1-1, pg. 1, ¶ 2]. Westfield's losses and expense vouchers show that as of February 14, 2022, Westfield's actual paid losses related to the K & F Construction bonds equaled $104,611.92 [Doc. 34-1]. Thus, the citations to the Byrd Affidavit disputing Westfield's loss amount do not suffice to raise a genuine issue of material fact as to that claim.

In Paragraphs 26 and 35 of the Byrd Affidavit, Byrd claims Westfield acted in bad faith when it settled the CCS lawsuit, and Byrd believes Westfield will not act in good faith if she or the other Indemnitors deposit cash or collateral with Westfield [Doc. 27, ¶¶ 26, 35]. The first claim is not supported by the record and does not raise a genuine issue of material fact sufficient to place Westfield's claimed losses and expenses in dispute. Regardless, Westfield did not act in bad faith when it settled the CCS lawsuit because the Indemnity Agreement gives Westfield the right "to adjust, settle or compromise any claim, demand, suit or judgment related [to the K & F Construction bonds] or contracts referenced in the [K & F Construction bonds], whether arising on behalf of itself, or in the name of any Contractor or other Indemnitor[.]" [Doc. 1-1, pg. 4, ¶ 15].

7

Westfield had a contractual right to settle the CCS claim, and its choice to do so after that lawsuit had been pending for nearly four years was reasonable, especially considering K & F Construction was dismissed from the action when it filed for bankruptcy. Byrd's contention that Westfield may not act in good faith if she deposits collateral is pure speculation and fails to raise a genuine dispute as to Westfield's claimed losses.

The Indemnitors next cite paragraphs 30 and 31 of the Byrd Affidavit to refute Westfield's claimed loss amount. In those paragraphs, Byrd claims Westfield sent its demand for collateral to the Indemnitors on the "exact same day K & F Construction filed its Petition for Chapter 11 bankruptcy," and that Westfield demanded the Indemnitors "immediately provide $200,000 collateral" if the Indemnitors wished for Westfield to contest the CCS claim. Even if these statements were somehow relevant to the amount of Westfield's claimed losses, Westfield had a contractual right to demand collateral for any losses it might incur in the CCS lawsuit. The Indemnity Agreement provides that "[w]henever liability exists or is asserted against [Westfield] . . . [Westfield] may demand, and the Indemnitors shall deposit with [Westfield], cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to [Westfield] in its sole discretion." [Doc. 1-1, pg. 1, ¶ 2]. By its terms, the Indemnity Agreement grants Westfield the power to demand collateral and to determine the amount and type of that collateral. It was not unreasonable for Westfield to exercise that power when CCS made a claim against the College Contract Bond. Nor was the $200,000 collateral demand unreasonable, considering CCS sought payment of $172,613.67 in unpaid wages and expenses [Doc. 1-3]. Though the Indemnitors dispute Westfield's claimed actual losses, they have failed to point to any evidence in the record. Accordingly, Westfield is entitled to reimbursement for its actual expenses according to the terms of the Indemnity Agreement because the losses were incurred "by reason

8

of [Westfield] having executed the [construction bonds to K & F Construction]" and "in enforcing . . . the conditions of [the Indemnity Agreement]." [Doc. 1-1, pg. 1, ¶ 2].

The Indemnitors next argue that, notwithstanding any dispute over the loss amount, Westfield is not entitled to reimbursement because the loss "was caused by Westfield's acts of bad faith." [Doc. 26, pg. 3]. They contend Westfield "was upset that Ms. Byrd and K & F Construction had chosen to utilize a different surety bond company" and "harbored animosity toward the Indemnitors[.]" [Doc. 26, pg. 3]. This animosity, they argue, led Westfield to force Cantrell (counsel for K & F Construction) to withdraw from the CCS case and caused Westfield, out of anger, to settle the CCS claim even though "Westfield knew the claim was frivolous and had no merit." [Doc. 26, pg. 3]. Finally, the Indemnitors claim Westfield's "bad motive" was further accentuated by its refusal to contest the CCS claims until the Indemnitors deposited the $200,000 collateral to indemnify Westfield in the CCS lawsuit [Doc. 26, pg. 4].

"[I]n order for a surety to recover under an indemnity agreement [in Tennessee], the surety must act both reasonably and in good faith." *Gulf Ins. Co. v. Construx, Inc.*, No. M199902803COAR3CV, 2001 WL 840240, at *17 (Tenn. Ct. App. July 26, 2001)(quoting *Feld Truck Leasing v. ABC Transnational Transp.*, 681 S.W.2d 554, 555-56 (Tenn. Ct. App. 1984)). Good faith and reasonableness "should be determined in the context of the specific factual situation involved," and if there is any doubt as to whether good faith and reasonableness exist, summary judgment "must be denied." *Id*. at *19. The good faith requirement imposes an "honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of the law." *Lane v. John Deere Co.*, 767 S.W.2d 138, 140 (Tenn. 1989) (internal citation omitted). To determine bad faith, courts consider such factors as a party's knowledge of the other's insecure circumstances at the time of contracting, the nature and value of the collateral,

9

any instance of deceit or outrageous conduct, any abrupt departure from the established course of dealing, and a party's oppressive use of its superior position. *Id*.

The Court has already found meritless the Indemnitors' argument that Westfield acted in bad faith when it settled the CCS claim because the Indemnity Agreement gave Westfield the right to settle that lawsuit. Further, Westfield has proven it did not force Cantrell to withdraw from the CCS case as the Indemnitors claim. The evidence shows K & F Construction, and not Westfield, told Cantrell to withdraw from representing Westfield in the CCS lawsuit [Doc. 34-5]. The CCS settlement amount of $47,500 was also reasonable considering CCS's much higher claim of $172,613.67. The Court has also addressed and found reasonable Westfield's demand for collateral in the amount of $200,000. Westfield had the right to demand collateral pursuant to the Indemnity Agreement and to name the collateral amount in its sole discretion. And the $200,000 collateral demand was not unreasonable considering the amount of CCS's claim and the anticipated attorneys' fees and costs.

Moreover, none of the hallmark factors showing bad faith are present here. There is no evidence that Westfield sought to intentionally take advantage of the Indemnitors by settling the CCS lawsuit. Nor is there any evidence that Westfield was deceitful or outrageous in its behavior, or that Westfield capitalized on any perceived weakness or inferior bargaining power of the Indemnitors when they executed the Indemnity Agreement. Instead, the record reflects that Westfield conceded to the Indemnitors handling the CCS lawsuit for several years until K & F Construction petitioned for bankruptcy and instructed Attorney Cantrell to withdraw from representing Westfield. Only then did Westfield take charge of the CCS lawsuit on its own behalf and settle CCS's claims. This was reasonable, considering the Indemnitors refused to post collateral for the CCS claim, even though the Indemnity Agreement required them to do so.

The Indemnitors state Westfield knew the CCS claim was frivolous, but beyond these conclusory statements, they provide no evidence that the claim was, indeed, frivolous, or that Westfield had any knowledge of the same. On the contrary, CCS provided Westfield with detailed supporting documentation about its unpaid wages related to the College Contract [Doc. 1-3]. Nor is there any evidence, beyond Byrd's bare conjecture, that Westfield harbored animosity against the Indemnitors or K & F Construction for choosing a different bond surety. The Indemnitors have not shown that Westfield acted unreasonably or in bad faith, and Westfield has provided sufficient proof that it has incurred losses of $104,611.92 related to the K & F Construction surety bonds as of February 14, 2022. Westfield is therefore entitled to reimbursement from the Indemnitors in that amount as a matter of law.

**B.    Westfield's demand for specific performance of collateral.**

As of March 18, 2022, Westfield seeks specific performance of the collateral security provisions contained in the indemnity agreement in the amount of $163,247.51[6] to secure the Indemnitors' pending obligations to Westfield [Doc. 1, ¶ 30; Doc. 20, pg. 7; Doc. 33, pg. 23]. The Indemnitors argue Westfield's collateral request should be denied as "unreasonable and made in bad faith." [Doc. 26, pg. 5]. First, they argue Westfield has conducted no investigation into the validity of any of the three alleged outstanding claims. But Pentecost declared that he "independently investigated each of the claims," and attests to the claim amounts [Doc. 34, ¶ 10]. The existence of the Duracap and TPM claims is further verified through the Indemnitors' own answer to the complaint and the Byrd affidavit [Doc. 12, ¶¶ 22-24; Doc. 27, ¶¶ 6, 11]. The

---

[6]     The current outstanding claims against the K & F Construction bonds are the Duracap claim against the Middlebrook Bond for $22,157.25, the TPM claim against the Middlebrook Bond for $35,340.62, and the Wilbert Funeral Services claim against the Veteran Cemetery Bond for $105,749.64, totaling $163,247.51 [Doc. 34, ¶ 10].

11

Indemnitors contend that Westfield has offered no evidence at all of the Wilbert Funeral Services claim against Payment Bond 8069381, which accounts for $105,749.64 of Westfield's collateral demand [Doc. 26, pgs. 4-5; Doc. 33, pg. 22]. But Pentecost includes the claim in his declaration that he "independently investigated" each of the claims [Doc. 34 ¶ 9]. Though Byrd states she is not aware of any "investigation into the validity of any supposed bond claim made by Wilbert Funeral Services," she does acknowledge that Wilbert Funeral Services filed a claim against K & F Construction in its bankruptcy proceedings [Doc. 27, ¶¶ 20, 22]. At any rate, Byrd's lack of knowledge as to whether Westfield conducted any investigation into the validity of the outstanding bond claims does not suffice to dispute Pentecost's sworn declaration that he, in fact, conducted such an investigation.

The Indemnitors next argue Westfield's collateral demand "has no reasonable basis in fact" because Duracap, TPM, and Wilbert Funeral Services have not initiated any lawsuits against Westfield or threatened imminent litigation for any claims against the bonds [Doc. 26, pg. 5]. But the Indemnity Agreement does not require the claims be brought in a lawsuit, nor that they be "imminent" for Westfield to exercise its right to demand collateral. Instead, it provides that the Indemnitors shall deposit collateral in an amount satisfactory to Westfield at its sole discretion "whenever liability exists or is asserted against [Westfield]." [Doc. 1-1, ¶ 2]. The collateral provision in the Indemnity Agreement is intended to *prevent* Westfield's loss from becoming imminent, not to provide remedy only after a potential loss becomes imminent. *Selective Ins. Co. of Am. v. KCS Constr., LLC,* 2018 WL 2183840, at *4 (M.D .Tenn. May 10, 2018). Arguably, Westfield has already suffered immediate, irreparable harm because the Indemnitors failed to post the requested $200,000 collateral in relation to the CCS lawsuit. *Id*. ("Courts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability

has been asserted against them.") (internal quotation marks and citations omitted).  The collateral provision in the Indemnity Agreement requires the Indemnitors to take affirmative action so as not to allow unresolved claims to linger against Westfield and to indemnify Westfield from loss as a result of those claims.  Nor is Westfield's collateral demand amount of $163,247.51 unreasonable, as the Indemnitors argue.  Westfield has reduced its collateral demand to match the exact amount of the known outstanding claims against the bonds.

Finally, the Indemnitors argue that Westfield "has already undertaken to obtain a security interest on all of Defendants' property," citing the UCC financing statement filed on January 5, 2021 which grants Westfield a security interest in the Indemnitors' assets [Doc. 26, pg. 5, citing Doc. 27-1].[7]  The Indemnitors contend this security interest "provides more than adequate collateral for Westfield" given the "lack of imminent exposure or irreparable harm to Westfield." [Doc. 26, pg. 5-6].  This argument is unpersuasive.  In the Indemnity Agreement, the Indemnitors granted Westfield this security interest *in addition* to the right to demand collateral, not in lieu of that right [Doc. 1-1, pg. 2, ¶ 15].  Nothing in the Indemnity Agreement states that the security interest precludes Westfield from demanding collateral to prevent and/or resolve liability asserted against the bonds. *See Westfield Ins. Co. v. Rainey Contracting, LLC,* 179 F. Supp. 3d 798, 801-802 (E.D. Tenn. 2016) (holding Westfield would suffer "irreparable harm" absent an injunction enforcing collateral demand, despite Westfield's "perfected security interest in collateral assets of defendants.").  By the terms of the Indemnity Agreement, Westfield "has bargained for the right to demand collateralization for anticipated losses and [the Indemnitors' refusal to post] such collateralization amounts to irreparable harm to the surety company." *Id.* at 802. Westfield is

---

[7]  The Indemnitors cite the "Affidavit of Francis Byrd, Exhibit 2," but Exhibit 2 is an email from Duracap [*see* Doc. 27-2].  The financing statement is filed as Byrd Affidavit Exhibit 1 and docketed as [Doc. 27-1].

therefore entitled to specific performance of the collateral source provisions contained in the Indemnity Agreement because the sureties lack an adequate remedy at law for the breach of those provisions.

IV. **CONCLUSION**

For the above stated reasons, Westfield's motion for summary judgment [Doc. 19] is **GRANTED** as to all of Westfield's claims, and Westfield is entitled to judgment as a matter of law as to all counts of its complaint [Doc. 1]. Accordingly, it is hereby **ORDERED** that the Indemnitors, jointly and severally, shall provide to Westfield:

(1) indemnity in the form of cash reimbursement of **$104,611.92** for Westfield's verified losses and expenses as of February 14, 2022, which were incurred by reason of Westfield having issued the K & F Construction bonds, and in enforcing the Indemnity Agreement between the parties; and

(2) specific performance of the collateral security provisions contained in the indemnity agreement requiring Indemnitors to post collateral security in the amount of **$163,247.51.**

A separate judgment will enter.

**SO ORDERED:**

s/Clifton L. Corker  
United States District Judge
